1

2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

3

4

5

6

7

8

9

RENEE L. EVANS,

　　　　　Plaintiff,

　v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

　　　　　Defendant.

No.  C 07-2153 SBA

**ORDER**

[Docket Nos. 10, 11]

10    Before the Court is plaintiff Renee L. Evans' ("Evans" or "Claimant") Motion for Summary

11    Judgment (the "Motion") [Docket No. 10] and defendant's Cross Motion for Summary Judgment

12    and Opposition to Plaintiff's Motion for Summary Judgment (the "Cross Motion" or "Opposition")

13    [Docket No. 11].  Evans appeals defendant's decision that she is neither disabled nor eligible for

14    disability or supplemental security income benefits under Subchapters II or XVI, respectively, of the

15    Social Security Act, 42 U.S.C. § 301 *et seq.*[1]

16    For the reasons discussed in this Order, the Court finds that defendant's decision is supported

17    by substantial evidence and free of legal error.  Accordingly, the Court GRANTS the Cross Motion,

18    DENIES the Motion, and AFFIRMS the defendant's decision.

19    **BACKGROUND**

20    Evans is a 47-year old woman who was born on November 22, 1960, and who has an 8th

21    grade education with 2 or more years of post-secondary education.  Her work experience consists of

22    employment as a bus driver, a restaurant cook, a paratransit driver, and a housekeeper.  The claimant

23    has not engaged in substantial gainful activity at any time from October 7, 2002 to March 21, 2006,

24    due to anxiety disorder, depression, and suicidal thoughts.

25

26

27

28

[1]Subchapter II of the Social Security Act, 42 U.S.C. § 401 et seq., governs old age, survivors, and disability insurance (OASDI) benefits, while subchapter XVI, 42 U.S.C. § 1381 et seq., governs Supplemental Security Income for the aged, blind, and disabled.

Evans protectively filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income benefits (SSI) on October 24, 2003. The Social Security Administration denied these applications initially, on September 21, 2004, on reconsideration, on January 10, 2005, and after a hearing before an Administrative Law Judge ("ALJ"), on March 21, 2006.

## LEGAL STANDARD

### I.      Standard of Review

The substantial evidence standard governs a district court's review of a final decision made by the Commissioner of the SSA. As 42 U.S.C. § 405(g) states:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party ... may obtain a review of such decision by a civil action .... As part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, *if supported by substantial evidence,* shall be conclusive ....

42 U.S.C. § 405(g) (emphasis added); *Udd v. Massanari*, 245 F.3d 1096, 1100 (9th Cir. 2001); *Evans v. Chater*, 110 F.3d 1480, 1483 (9th Cir. 1997). When the Appeals Council declines to review an ALJ's decision, it stands at the Commissioner's final decision. *Bass v. Social § Admin.*, 872 F.2d 832, 832 (9th Cir. 1989).

A court may reverse an ALJ if his or her findings "are based on legal error or are not supported by substantial evidence." *McCartey v. Massanari*, 298 F.3d 1072, 1075 (9th Cir. 2002). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Evans*, 110 F.2d at 1483 (quoting *Flaten v. Sec'y of Health and Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)). "Substantial evidence is 'more than a mere scintilla,' but 'less than a preponderance.' " *Evans*, 110 F.2d at 1483 (quoting *Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990) (citations omitted)). "If the record

2

considered as a whole can reasonably support either affirming or reversing the Commissioner's decision [a court] must affirm." *McCartey*, 298 F.3d at 1075.

## II.        The Five-Step Disability Inquiry

To establish a claimant's eligibility for disability benefits under the Social Security Act, it must be shown that: (a) the claimant suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months; and (b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *See* 42 U.S.C. § 423(d)(2)(A).   If a claimant meets both requirements, he or she is "disabled." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see* 42 U.S.C. §§ 416(i), 423(d), 1382c(3)(A).

The SSA regulations provide a five-step sequential evaluation process for determining whether a claimant is disabled within the meaning of the Social Security Act.   20 C.F.R. §§ 404.1520, 416.920.[2]   The claimant has the burden of proof for steps one through four, and the Commissioner has the burden of proof for step five. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001).

The five steps of the inquiry are:

1.        Is claimant presently working in a substantially gainful activity?  If so, then the claimant is not disabled within the meaning of the Social Security Act.  If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2.        Is the claimant's impairment severe?  If so, proceed to step three.  If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3.        Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1?  If so, then the claimant is disabled.  If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d)

4.        What is the claimant's residual functional capacity and past relevant work?  Is the claimant able to do any work that he or she has done in the past given her functional capacity?  If so, then the claimant is not disabled.  If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

---

[2]        All regulatory citations herein are to the 2008 Code of Federal Regulations.  The 404-series regulations in title 20 address DIB, while the 416-series regulations address SSI.  The two series have many regulations which parallel each other or are similar in content.  Hence, they are often cited together, in cases where as here, a claimant has applied for both DIB and SSI.

5.      Is the claimant able to do any other work?  If so, then the claimant is not disabled.  If not, then the claimant is disabled.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

## DISCUSSION

At step one, the ALJ found that the claimant had not performed substantial gainful activity and proceeded to determine the severity of claimant's alleged impairments. (AR 19.)  At step two, the ALJ found that claimant's impairments or combination of impairments are "severe" within the meaning of the regulations because they significantly restrict the claimant's ability to perform basic work activities.  20 CFR 404.1521. (AR 19-20.)

At step three, the ALJ found that none of the claimant's impairments, either alone or in combination, meet the criteria of any of the listed impairments described in Appendix 1 of the regulations, 20 CFR, Part 404.1520(d).  (AR 20)  The ALJ explained that although the claimant suffers from depression, "this has caused her only a 'mild' degree of impairment in her ability to perform her activities of daily living or to maintain concentration, persistence, and pace, and a 'moderate to marked' limitation in social functioning."  (AR 20)  The ALJ also based his conclusion on his findings that the claimant does not have any "gross anatomical deformity" and no "joint space narrowing, bony destruction, or ankylosis of the affected joint."  (AR 20)

At step four, the ALJ determined claimant's Residual Functional Capacity ("RFC") and whether she is capable of returning to her past relevant work in light of her RFC.  The ALJ determined that:

> claimant has the residual functional capacity to lift and carry 10 pounds, to stand and walk for 2 hours in an 8-hour day, and to sit for 6 hours in 8.  The claimant requires a cane for walking for longer than 15 minutes.  She is able to perform only simple, repetitive tasks with only occasional required interaction with the public and coworkers, and she must receive job-related instructions through demonstrations and oral instructions, not through written communications.

(AR 28)

The ALJ also accepted, at step four, the vocational expert's ("VE") testimony that an individual with claimant's RFC would not be able to perform the claimants past relevant work.  (AR 27)

4

At step five, based on the testimony of the VE, the ALJ found that the claimant is able to perform jobs existing in significant numbers in the national economy despite her RFC.  20 CFR 404.1520(g).  Accordingly, he found the claimant not "disabled" as defined by the Social Security Act and regulations, at any time beginning October 6, 2002 through the date of his decision.  (AR 27-28)

Evans contends that the ALJ's findings concerning her RFC and ability to do other work at steps four and five respectively were flawed.  Specifically, she argues the ALJ: 1) failed to set forth a clear RFC assessment; 2) improperly dismissed medical opinion evidence; 3) issued a credibility finding inconsistent with the record as a whole; and 4) applied incorrect legal standards in taking testimony from the vocational expert including failing to offer complete hypothetical questions.

For the following reasons, the Court rejects these arguments and holds that the ALJ's decision is free of legal error and supported by substantial evidence.

**I.    The ALJ's RFC assessment is clear, free of legal error, and supported by substantial evidence.**

    **A.    The ALJ's RFC assessment is clear.**

Evans argues that the ALJ creates an ambiguous record by providing inconsistent findings regarding Evans' mental RFC.  At step two, the ALJ found that "[a]lthough the claimant suffers from depression, this has caused her only a 'mild' degree of impairment in her ability to perform activities of daily living or to maintain concentration, persistence, and pace, and a 'moderate to marked' limitation in social functioning."  (AR 20)  At step four, the ALJ states, "I agree that the claimant is able to perform only simple, repetitive tasks with only occasional required interaction with the public and coworkers, but her ability to engage with professors, counselors, and others at school cause me to reject Dr. Huffman's opinion that the claimant suffers a 'marked' impairment in dealing with supervisors."  (AR 25)  Evans argues that such findings render the ALJ's RFC fatally ambiguous because a reviewing court cannot readily discern the basis of the ALJ's decision.

The ALJ's rejection of treating physician Dr. Huffman's opinion, that Evans has a "marked" limitation in dealing with supervisors, is not in fatal conflict with the ALJ's own step two opinion of "mild to marked" limitations in social functioning.  The ALJ refuted Dr. Huffman's opinion

explaining that plaintiff had demonstrated an ability to "work with other superiors, including professors and others at Merritt College, with no apparent problem." (AR 23)   The reasonable inference from the ALJ's finding is that Evans could get along with other people, namely persons in positions of authority, such as professors, counselors, and others, when she was motivated to do so. *Nikitchuk v. Astrue*, 240 Fed. Appx. 740, 742 (9th Cir. Cal. 2007) ("[ALJ's] findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the [ALJ's] decision.").  However, "dealing with supervisors" is a very specific, limited situation, as opposed to a much larger, wider, more global situation encompassed by the phrase "social functioning," which covers anything along a spectrum from encountering the letter carrier daily, to dislike of going to parties, to fear of being in crowds. Thus, the ALJ's finding that Evans suffered a "mild to marked" limitation in social functioning does not conflict with his finding that Evans did not suffer from a "marked" limitation in dealing with supervisors.

Similarly, the ALJ's finding at step two, that claimant's depression causes her only a "'mild' degree of impairment in her ability to perform activities of daily living or to maintain concentration, persistence, and pace," is not inconsistent with his finding at step four that "claimant is able to perform only simple, repetitive tasks with only occasional required interaction with the public and coworkers."  "Activities of daily living" reasonably implies "simple, repetitive tasks" such as an individuals' cleaning, eating, and transportation habits.  *See* AR 297 ("Claimant stated that she is able to wash and dress herself, do household chores, fix meals, do laundry, go shopping, and take public transportation.").  The ALJ found that the claimant was capable, despite her impairments, to perform such routine and simple tasks with which the plaintiff was familiar.  Indeed, at step four, the ALJ explained that notwithstanding claimant's impairments, "she is able to perform all of her activities of daily living, including caring for her son, while at the same time juggling school, AA meetings, parental support meetings, and individual therapy sessions."  (AR 24)

However, at the same time, the ALJ found that successfully completing more complex work tasks entailing precise instructions, changing routines, and increased pressure, was precluded by claimant's impairments.  This work-specific finding, in contrast to his general findings at step two

6

concerning claimant's ability to perform daily life tasks, was based on the medical evidence, which

established that claimant had a "moderate impairment in her ability to understand and remember

detailed *instructions*, make judgments on simple *work-related* decisions, interact appropriately with

*coworkers*, respond appropriately to *work pressures* in a usual work setting, and respond

appropriately to *changes in a routine work setting*." (AR 23) (emphasis added)

Accordingly, Evans' arguments that the ALJ's findings are internally inconsistent and

ambiguous are unpersuasive.  The Court finds that the ALJ's findings are clear, based on the

evidence in the record, and permit a court to intelligently review his decision.  *See Vincent on behalf*

*of Vincent v. Heckler*, 739 F.2d 1393, 1394 (9th Cir. Cal. 1984) (Secretary must make findings in

support of administrative decisions to permit courts to review those decisions intelligently).

**B     The ALJ properly evaluated the medical opinion evidence in the record.**

Evans argues that the ALJ's RFC assessment is not supported by the record.  Specifically,

Evans contends that the ALJ's RFC finding is contrary to the opinions of four treating sources, and

that he failed to provide specific and legitimate reasons for rejecting the treating physicians' medical

opinions.

**1.     The Legal Standard**

A clamant's RFC is the most they can still do despite their limitations.  *Id.*

§§ 404.1545(a)(1), 416.945(a)(1).  The SSA assesses a claimant's RFC based on all the relevant

evidence in their case record.  *Id.* §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The

determination, however, turns solely on a claimant's medically determinable impairments, whether

severe or not.  *Id.* §§ 404.1545(a)(2), 416.945(a)(2); SSR 96-8p paras. 7, 17-18.  It does not turn on a

claimant's age, body build, e.g., height or weight, or prior activities.  SSR 96-8p para. 1 ¶ 2, para. 7.

While the claimant bears the burden of producing evidence for determining their RFC, the SSA will

make reasonable efforts to develop a complete medical history for the pertinent twelve-month

period, by contacting the claimant's providers or arranging for a consultative examination, if

necessary.  20 C.F.R. §§ 404.1512(c)-(f), 404.1545(a)(3), 404.912(c)-(f), 416.945(a)(3).

**a.     Treating Versus Non-Treating Sources**

Title 20 C.F.R. § 404.1527 states, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. §§ 404.1527(b), 416.927(b).  "Medical opinions are statements from physicians and psychologists or other acceptable medical sources ...." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). An "[a]cceptable medical source ... includes treating sources, nontreating sources, and nonexamining sources." *Id.* §§ 404.1502 para. 1, 416.902 para. 1; *see Lester v. Chater*, 81 F.3d 821, 830, 830 n.7 (9th Cir. 1995).

A "treating source" means a physician, psychologist, or other acceptable medical source who provides or has provided a claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with them.  20 C.F.R. §§ 404.1502 para. 7, 416.902 para. 7.  An "ongoing relationship" has "a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [their] medical condition(s)." *Id.*  A physician who supervises a team of persons who together have an "ongoing relationship" with a claimant, qualifies as a "treating physician." *Benton v. Barnhart*, 331 F.3d 1030, 1037-39 (9th Cir. 2003).

In contrast, a "nontreating source" means a physician, psychologist, or other acceptable medical source who has examined a claimant, but does not have nor ever had an ongoing treatment relationship with them.  20 C.F.R. §§ 404.1502 para. 6, 416.902 para. 6.  This includes any acceptable medical source with whom the claimant's only relationship is or was not based on their need for treatment or evaluation but only for obtaining a report to support a disability claim. *Id.* A "nonexamining source" means a physician, psychologist, or other acceptable medical source who has not examined a claimant, but who provides a medical or other opinion in their case. *Id.* para. 5.

### c.      The weighting process.

If a treating source's opinion on the issue(s) of the nature and severity of a claimant's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," it will be given controlling weight.  20 CFR 404.1527.  For treating sources which are not controlling, or for other acceptable medical sources, such as consultative doctors, the SSA weighs the following six factors: (1) Examining Relationship:  The SSA generally accords more weight to an examining source, than

a non-examining source.  20 C.F.R.  §§ 404.1527(d)(1), 416.927(d)(1).  (2) Treating Relationship:  The SSA generally accords more weight to an treating source, than a non-treating source.  *Id.*  §§ 404.1527(d)(2), 416.927(d)(2).  In weighing such a source, the SSA will consider the length, frequency, and nature of treatment, including whether any testing was done.  *Id.*  (3) Supportability:  The SSA generally accords more weight to a medical source who presents greater relevant evidence to support their opinion, particularly medical signs, laboratory findings, explanations, or reviews of other source's records and opinions.  *Id.* §§ 404.1527(d)(3), 416.927(d)(3).  (4) Consistency:  The SSA generally accords more weight to an opinion consistent with the record as a whole.  *Id.*  §§ 404.1527(d)(4), 416.927(d)(4).  (5) Specialization:  The SSA generally accords more weight to a specialist's opinion in their area, than a non-specialist's opinion on the same topic.  *Id.*  §§ 404.1527(d)(5), 416.927(d)(5).  (6) The SSA will also consider other relevant factors, such as how well the source understands how the SSA's disability programs operate.  *Id.* §§ 404.1527(d)(6), 416.927(d)(6).  *See also* SSR 96-5p paras. 7, 9-10 (In determining a reserved issue, the SSA must never ignore medical opinions, but must apply § 404.1527(d) and § 416.927(d) factors to them.).

As the Ninth Circuit has held:

> As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.  At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  We have also held that "clear and convincing" reasons are required to reject the treating doctor's ultimate conclusions.  Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing.

*Benton*, 331 F.3d at 1037-39 (quoting *Lester*, 81 F.3d at 830 (citations omitted)).

### d.   Dr. Huffman, M.D. and Dr. Khoi, Ph.D.

In February 2006, Evans' psychiatrist, Dr. Huffman, opined that the claimant would have a marked impairment in her ability to carry out detailed instructions or interact appropriately with supervisors; a moderate impairment in her ability to understand and remember detailed instructions, make judgment on simple work-related decisions, interact appropriately with coworkers, respond appropriately to work pressures in a usual setting, and respond appropriately to changes in a routine

work setting; and only slight impairment in her ability to understand, remember, and carry out simple instructions or to interact appropriately with the public.  (AR 23)

On August 2004, Evans underwent a state agency consultative neuropsychological evaluation.  On mental status examination, the consultative psychologist, Sokley Khoi, Ph.D., found the claimant to have a slight restricted affect, depressed mood, and suicidal ideation without a plan or intent, but Dr. Khoi noted that Evans had no auditory or visual hallucinations, had logical and coherent thought processes, and no overt signs of psychosis." (AR 297-300)  Dr. Khoi also found that Evans "put forth inadequate effort on testing" and she diagnosed Evans with malingering (cognitive symptoms), depressive disorder not otherwise specified versus dysthymic disorder, and polysubstance abuse/dependence, in remission per claimant.  (*Id.*)  Notably, Dr. Khoi found Evans to be, at most, only mildly impaired in her ability to withstand daily stress and interact appropriately with coworkers and others."  (*Id.*)

Contrary to the implication in Evans' memorandum in support of her motion, Dr. Huffman's opinion, although he was a treating source, was not entitled to controlling weight, because it was not supported by independent clinical findings and was inconsistent with other substantial evidence.  20 CFR 404.1527 ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.").  Whereas in response to the question, "What medical-clinical findings support this assessment?" Dr. Huffman answered, "No," Dr. Khoi, the consultative psychologist conducted a neuropsychological screening evaluation.  (AR 297-300, 361-62).  And, Dr. Huffman's opinion was contradicted by Dr. Khoi's.  Nonetheless, the ALJ explained that he based his RFC assessment primarily on the reports of the consultative examiner, Dr. Khoi, *and* the treating physician, Dr. Huffman, finding that Evans' actual functional limitations fell between their opined limitations.  (AR 25, 296-300, 361-62)

Evans argues that the ALJ's decision is unclear as to show he reached his determination as to the apparent weight given to Dr. Huffman's opinion.  However, as explained above, the ALJ explained that he could not credit Dr. Huffman's opinion that Evans had marked limitations in her

ability to relate to supervisors because it was refuted by evidence of her ability to get along with other superiors such as professors.  But otherwise the ALJ interpreted Dr. Huffman's opinion as fairly consistent with that of Dr. Khoi, and he accepted both with some modification.  (AR 23).  The ALJ explained "I am therefore left with the opinions of Dr. Khoi and Dr. Huffman as to the claimant's functional capacity, opinions I believe are fairly easily reconciled.  It is clear that the claimant is not able to perform detailed tasks, and that some level of restriction on her interaction with others, including the public and coworkers, is warranted."  Thus, the ALJ weighed the evidence and reconciled the conflicting opinions of Dr. Khoi and Dr. Huffman finding that Evans had greater limitations than Dr. Khoi found after formal testing.

Accordingly, the ALJ offered specific and legitimate reasons supported by substantial evidence for rejecting Dr. Huffman's opinion that Evans suffered a marked impairment in her ability to interact appropriately with supervisors.  Namely, the ALJ found that Dr. Huffman's conclusion was inconsistent with the record as a whole given Evans' demonstrated ability to get along with superiors such as professors.  *See, e.g.*, AR 245 (Diagnostic Summary Report from Merritt College) ("I have enjoyed having Renee as a student in my class."); 20 CFR 404.1527 ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). As explained above, the remainder of Dr. Huffman's opinion was largely consistent with that of Dr. Khoi's and the ALJ properly balanced their diagnoses in finding Evans' RFC. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. Or. 1995) (It is solely the province of the ALJ to resolve conflicting medial evidence).

### e.      Dr. Sims, Ph.D.

In a September 2002 Psychological Disability Verification form for Merritt College, another of Evans' treating sources, Mary Jayne Sims, Ph.D., diagnosed the claimant with chronic, moderate adjustment disorder with mixed anxiety and depressed mood.  In response to being asked to describe the functional limitations, Dr. Sims wrote: "Depending on stress level client has a hard time concentrating and level of comprehension."  (AR 294)  Evans argues that the ALJ erred in rejecting Dr. Sims' diagnosis claiming that his finding was not supported by any "medical evidence."

1    The ALJ concluded Dr. Sims' opinion was "unhelpful" because the ALJ found that Evans

2    was able to learn, to concentrate, and to comprehend, as indicated by her school activities, citing AR

3    245 (Diagnostic Summary Report from Merritt College) ("Renee was highly motivated, task-

4    oriented and cooperative during the assessment.  She though about her responses and continued to

5    work on test items even when they were difficult.").  Moreover, Dr. Sims' opinion was contradicted

6    by Dr. Khoi's opinion that, notwithstanding Evans' inadequate motivation and effort in the WAIS-

7    III and Rey 15-Memory Test-II, her cognitive functioning was estimated to be in the low average

8    range and she had no impairments in her ability to follow complex/detailed instructions (AR 299-

9    300)

10   Accordingly, the ALJ gave specific and legitimate reasons based on substantial evidence for

11   rejecting Dr. Sims' vague and brief assessment.  20 CFR 404.1527 (the less a medical sources

12   presents relevant evidence to support an opinion, the less weight it will be given).

13                     **f.      Dr. Roxan, M.D.**

14   In a June 2004 certification to the Alameda County Social Services Agency, Dr. Roxan

15   opined that Evans is unemployable.  However, her opinion reads in full: "Patient is going to school

16   full time; attending AA; attend parental stress and see therapist.  *Patient is unable to work in*

17   *addition to the above activities*."  (AR 289) (emphasis added).  The ALJ found that Dr. Roxan's

18   opinion "essentially is meaningless, as it found the claimant to be unemployable not on the basis of

19   her disability but because of full-time school and various counseling/therapy programs."  (AR 23)

20   Evans contends that the ALJ incorrectly interpreted Dr. Roxan's opinion, arguing that it

21   meant that Evans is "unable to work *in addition* to the above activities."  Mem. At 18 (emphasis in

22   original).  Evans' apparent position is that Dr. Roxan's opinion meant that in addition to not being

23   able to work, for medical reasons, Evans ability to work is also precluded by her full time school,

24   AA and other meetings.  The Court disagrees with this interpretation.  The ALJ's interpretation of

25   the second sentence of Dr. Roxan's statement as meaning that Evans cannot work *because* she is

26   going to school, attending AA, parental stress and sees a therapist, is a reasonable interpretation of

27   Dr. Roxan's statement.  The implication of the statement is that the activities set forth in the first

28   sentence are, in Dr. Roxan's opinion, all Evans can handle.  This interpretation is rational and

12

1   therefore entitled to deference.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. Or. 2002) ("Where

2   the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's

3   decision, the ALJ's conclusion must be upheld").

4        Accordingly, the ALJ properly discounted Dr. Roxan's opinion because it was not based on

5   Evans' medically determinable functional limitations but rather on her extracurricular activities and

6   obligations.  20 CFR 404.1527 ("Medical opinions are statements from physicians and psychologists

7   or other acceptable medical sources that reflect judgments about the nature and severity of your

8   impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite

9   impairment(s), and your physical or mental restrictions.").

10              **g.**     **Dr. Posner, M.D. and Dr. Momi, M.D.**

11        In December 2004, Evans underwent a state agency internal medicine evaluation which

12   noted her history of right lower extremity impairment, but found few abnormalities on examination.

13   (AR 317-18)  Dr. Momi, M.D., the examining doctor, opined that Evans had no exertional

14   limitations in standing, walking, sitting, lifting, carrying, bending, stooping, reaching, handling,

15   fingering, or gripping. (AR 318-19)

16        In medical source statement dated February 16, 2006, Dr. Posner, opined that Evans would

17   be unable to lift or carry more than 10 pounds, could stand or walk for less than 2 hours in an 8-hour

18   workday, sit for less than 6 hours in 8, and cannot push or pull with her lower extremities.  (AR 417-

19   20)

20        The ALJ held that he could not agree with Dr. Momi that Evans has no functional

21   limitations, given the clear evidence of Evans' uneven leg lengths.  (AR 26, 372)  However, the ALJ

22   did not accept Dr. Posner's opinion, that Evans could not perform "sedentary" work,[1] either, finding

23   that his opinion was not supported by the medical evidence of record. (AR 26)  Dr. Posner had

24   stated:

25                  Currently, Ms. Evans has physical limitations *mostly, but not*

26                  *entirely*, associated with low back pain.  Exact etiology is
               unknown at this time and is currently being worked up,

27

28   [1] Jobs are classified according to their strength requirements.  20 C.F.R. §§404.1567 and 416.967. Sedentary work involves lifting nor more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.  *Id.*

1        orthopedics referral has been made, x-rays have been done, and
         patient waiting for physical therapy appointment.  Patient also has
2        history of motor vehicle accident in 1987 which left her with
         deformity of the mid-shaft of right tibia-uses cane.  I suspect it will
3        take approximately 6-9 months prior to having a clearer diagnosis.

4        (AR 418) (emphasis added)

5        The ALJ observed that Dr. Posner grounded his opinion mostly in the claimant's low back

6   pain, not her knee pain, explaining that there is not much in the evidence to establish the basis for

7   this back pain including X-ray results taken at La Clinica De La Raza.  (AR 26, 372)  The ALJ also

8   noted that Dr. Posner admitted that his diagnosis was inconclusive by stating that the "exact etiology

9   is unknown" and that "I suspect it will take approximately 6-9 months prior to having a clearer

10  diagnosis."  (AR 26, 418)  The ALJ found that in the absence of objective medical support, he could

11  not "accept wholesale Dr. Posner's opinion."  20 CFR 404.1527 ("The more a medical source

12  presents relevant evidence to support an opinion, particularly medical signs and laboratory findings,

13  the more weight we will give that opinion. The better an explanation a source provides for an

14  opinion, the more weight we will give that opinion.").

15       Neither the medial opinion of Dr. Momi nor Dr. Posner, was entitled to controlling weight

16  because each was contradicted by another medial source, namely the other Dr.'s opinion.   20 CFR

17  404.1527.  However, as he did with Evans' mental RFC, the ALJ weighed and balanced the

18  conflicting medial opinions finding Evans capable of limited range of sedentary work despite Dr.

19  Momi's opinion that Evans has "no limitations to sitting, standing or walking," no need for

20  "assistive devices," and "no limitations to reaching, handling, fingering, gripping, and feeling."  (AR

21  319)  In balancing the medical opinions before him, as well as rejecting the full extent of Dr.

22  Posner's opinion, the ALJ cited specific and legitimate reasons based on substantial evidence,

23  namely the conflicting opinion of Dr. Momi.

24       For the foregoing reasons, the ALJ's findings with respect to the medical opinions in the

25  record were proper.  *Benton*, 331 F.3d at 1037-39.

26       **C.      The ALJ's credibility finding is not legally flawed.**

27            **1.      Legal Standard**

28       According to the SSA, "[a] symptom is an individual's own description of his or her physical

14

or mental impairment(s)."  SSR 96-7p para. 4.  To admit symptom testimony, an ALJ uses a two-step process.  20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-7p para. 4; *Batson*, 359 F.3d at 1196.

First the claimant must identify one or more medically determinable impairments through objective medical evidence which could reasonably be expected to produce the alleged symptom.  20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-7p para. 5 sub-para. 1; *Batson*, 359 F.3d at 1196.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. SSR 96-7p para 5 sub-para. 2; *see* 20 C.F.R. §§ 404.1529(a), (c), 416.929(a), (c); *see Batson*, 359 F.3d at 1196.

"The entire case record" includes medical opinions, the claimant's statements, *et seq*.  SSR 96-7p para 5. sub-para. 2.  "When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements."  SSR 96-7p para. 6.  Additional information an ALJ may consider includes a claimant's daily activities; the location, duration, frequency, and intensity of their symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medications; treatment, other than medication; measures to relieve symptoms, e.g., lying flat on one's back; *et seq*.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p para. 6.

If an ALJ determines a claimant's statements are not credible, he or she must provide "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p para. 2 ¶ 5.  The Ninth Circuit requires "specific findings stating clear and convincing

reasons." *Batson*, 359 F.3d at 1196 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir.1996)).

### 2.     Discussion

The ALJ recognized that Evans had established an underlying medial impairment which could reasonably be expected to produce some subjective symptoms, *see, e.g.,* AR 299 ("depressive disorder"), he was required to provide specific, clear and convincing reasons to reject Evans' allegations of subjectively disability symptoms.

The ALJ explained at step four that he could not "go as far a the claimant urges in this case, to find her unable due to her depression to perform all work, because I do not find her fully credible."  (AR 23)  The ALJ's grounds for rejecting the full extent of Evans' testimony were: 1) her pattern of seeking treatment, foregoing treatment, and resuming treatment, because it coincided with the cessation of benefits or requests for letters to qualify her for benefits, suggesting that she was motivated by reasons other than her alleged symptoms; 2) her statements about the efficacy of her medications was inconsistent; and 3) claimant's allegations of being incapable of doing all work were belied by her activities over the course of her claim including attending college, caring for her son, AA meetings, parental support group meetings, and individual therapy sessions.

Evans contends that the ALJ's credibility finding is not supported by substantial evidence, arguing that 1) her sporadic treatment was due to lack of insurance coverage; 2) the ALJ failed to consider the side effects of claimant's medications, and 3) her daily activities were consistent with her alleged limitations.

As explained below, the Court finds that the ALJ cited clear and convincing reasons supported by substantial evidence for rejecting the claimant's testimony.  *Batson*, 359 F.3d at 1196

The ALJ observed that claimant exhibited a pattern of repeatedly seeking and then abandoning treatment (AR 24).  He explained:

> While I believe that a claimant's depressive symptoms would wax and wane over the years, the record suggest that the waxing and waning is not entirely due to the claimant's depression.  The claimant sought treatment in May 2003 after her unemployment benefits ended, and when she began her course of study at Merritt College and submitted her applications for housekeeping jobs at Children's Hospital.  The claimant's resumption of treatment also came accompanied by her request for a letter to the Department of Rehabilitation to qualify her for services.

(AR 24)

Evans contends that her sporadic treatment was due to a lack of insurance coverage. Specifically, Evans notes that in November 2002, she reported "no income/no ins."  However, the vast majority of her treatment occurred after November 2002, and Evans was not denied treatment at all of the medical facilities where she received treatment as indicated by the extensive medical record in this case.  For example, Evans was not denied treatment due to lack of insurance at Contra Costa County Health Service Mental Health (AR 265-81); Alameda County Department of Behavioral Health Care Services Mental Health Division (AR 249-64; 326-35); Summit Medical Center in Oakland (AR 282-90); Children's Hospital of Oakland (AR 292-95); the Schuman-Liles Clinic (AR 301-13, 336-60); or La Clinica de la Raza (AR 363-416).  Thus, Evans' 'lack of insurance' argument is refuted by her own medical record and his therefore unavailing.  The ALJ's finding that Evans' sporadic treatment was motivated, at least in part, by her desire to obtain benefits, is reasonably inferred from the foregoing substantial evidence.  *Nikitchuk v. Astrue*, 240 Fed. Appx. 740, 742 (9th Cir. Cal. 2007) ("[ALJ's] findings are upheld if supported by inferences reasonably drawn from the record")

Evans' daily activities were also cited by the ALJ in making his credibility findings.  The ALJ observed that Evans cared for her teenaged son, juggled her parental support meetings, AA meetings, her own school obligations, as well as individual therapy sessions (AR 24).  The ALJ found that Evans' demonstrated capacity to engage in such activities could be transferred to a work environment despite the fact that she had limiting impairments. (AR 23)  *Morgan v. Commissioner of the SSA*, 169 F.3d 595, 600 (9th Cir. Or. 1999) ("If a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations.").

Evans argues that she "need not be reduced to doing absolutely nothing in order for her to be found incapable of working 8 hours per day/5 days per week."  However, far from reducing her to doing absolutely nothing, the ALJ found that Evans was engaged in numerous activities including

1    attending college, albeit through a disability program, caring for her son, attending various therapy

2    sessions, and meetings.

3           The ALJ also found that the claimant's statements, that her medications were not helping,

4    were also not fully credible.  The ALJ explained that "[t]he claimant's records show that here

5    medications worked, at least until she ceased treatment, at which point, after 5 or 6 months, she

6    claimed that they never had worked."  (AR 24) For example, in August 2004, Evans told Dr. Khoi

7    that her medications "work allright [sic] *when I take them*."  (AR 299) (emphasis added)

8    Accordingly, the ALJ found that the claimant's problems with her medications were due more to her

9    own noncompliance, not to her medications' failure to work as they should.

10          Evans argues that the ALJ failed to consider the documented side-effects of her medication,

11   namely that they caused drowsiness.  However, Evans' claims, of disabling side effects from her

12   medications, were belied by her activities of daily living as explained above, which sufficiently

13   addresses any alleged side-affects of Evans' medications.  *Thomas v. Barnhart*, 278 F.3d 947, 954

14   (9th Cir. Or. 2002) (the ALJ may consider daily activities in assessing the credibility of a claimant's

15   subjective claims).

16          Moreover, the ALJ impliedly considered the opinions of Evans' doctors on her credibility

17   when he found that Evans' statements regarding her depressive symptoms are "probably self-serving

18   at times." (AR 23)  Notably, Dr. Khoi diagnosed Evans with Malingering (Cognitive Symptoms)

19   (AR 299).  While the ALJ did not outright adopt that diagnosis, neither did he reject it.  The ALJ

20   found that "on the whole, she is far more astute and facile with English than she alleges."  (AR 25).

21   In support of this finding, he cited the fact that she completed well-written and responsive forms

22   associated with her current disability applications (AR 176-83, 195-200), and, after claiming that she

23   did not know how, successfully filed an appeal and a request for a hearing.  (AR 25) Likewise, the

24   consultative psychiatrist, Dr. Johnston, described Evans as having a "loose relationship with the

25   truth," and noted that the claimant's history "would make truth telling a somewhat surprising

26   ingredient in a life so chaotic, addictive and given to external blame."  (AR 321)

27          In sum, the ALJ provided specific, clear and convincing reasons based on the record to find

28   that Evans' claims of being unable to perform all work was not "fully credible." Thomas, 278 F.3d

956-60.

**II.     The ALJ's questioning of the vocational expert was not legally flawed and the VE's testimony provides substantial evidence for the ALJ's findings at step five.**

At step five, the ALJ considers a claimant's RFC as well as her age, education, work experience, and transferable skills to determine whether she can perform any work besides her past relevant work, despite her impairments.  20 CFR 404.  Once a claimant has established that she cannot perform her past relevant work because of her impairments, the burden shifts to the Social Security Administration to show that there are other jobs existing in significant numbers in the national economy which she can perform, consistent with here medically determinable impairments, functional limitations, age, education, and work experience.  20 CFR 404.1520(g).

At a hearing held on March 21, 2006, the ALJ took testimony from a vocational expert concerning whether an individual with Evans' age, education, work experience, and RFC, as determined by the ALJ at step four, would be able to perform any jobs existing in significant numbers in the national economy.  The VE testified that such an individual would be able to perform the job of bench assembler, number 706.684-022 of the Dictionary of Occupational Titles ("DOT"), of which there are 1,600 jobs locally (San Francisco, Oakland, and 50-mile radius) and 60,000 jobs nationwide; and the job of non-agricultural packer, DOT number 920.587-018, of whether there are 2,100 jobs locally and 200,000 jobs nationwide.  (AR 27)  The ALJ accepted the testimony of the VE and found that Evans is able to perform jobs existing in significant numbers in the national economy.  (AR 27)

Evans objects to the ALJ's findings at step five on three different grounds.  First, she argues that the ALJ committed legal error by allegedly failing to ask the VE whether his testimony conflicted with the DOT.  Next, Evans argues that the ALJ's hypothetical questions were flawed because they allegedly failed to reflect the medical evidence in the record.  Finally, Evans contends that the jobs offered at step five are inconsistent with the evidence of her impairments.  For the following reasons, the Court disagrees with Evans' positions and finds that the ALJ's determination at step five was free of legal error, and the VE's testimony constituted substantial evidence, upon

which the ALJ relied in making his finding that Evans able to perform substantial gainful employment.  *McCartey*, 298, F.3d at 1075.

### A.        Questioning VE about Conflict with the DOE

Evans asserts that the ALJ failed to ask the VE about possible conflicts between the VE's testimony and the DOT, and, citing *Massachi v. Astrue*, 486 F.3d 1149, 1154 (9th Cir. Cal. 2007), argues that this constituted a per se legal error mandating reversal.  As will be explained below, Evans' contention is without merit because the ALJ affirmatively asked the VE about conflicts with the DOT and, contrary to plaintiff's assertion, a failure to ask is not a per se legal error under *Massachi*.

During the examination of Dr. Belchick, the vocational expert, the ALJ affirmatively asked him: "Okay.  Dr. Belchick, if at any time your opinion's different in any respect from the DOT, please tell us . . ." (AR 64) Later in the hearing, the VE, sue sponte, pointed out and resolved conflicts between his testimony and the DOT.  (AR 67, 79-80).  Thus, contrary to Evans' contentions, the record establishes that the ALJ did in fact ask the VE to identify any conflicts between his testimony and the DOT, and the VE's identification of several conflicts demonstrated his compliance with the ALJ's request.  On these grounds alone, the Court finds Evans' first objection lacks merit.

However,  *Massachi* does not hold that failure to question the VE about conflicts with the DOT is a per se legal error.  Rather, the Ninth Circuit held that because the ALJ did not ask the vocation expert whether her testimony conflicted with the DOT, the court could not determine whether the ALJ properly relied on her testimony.  *Massachi v. Astrue*, 486 F.3d 1149, 1153-1154 (9th Cir. Cal. 2007).  However, the Ninth Circuit noted that "[t]his procedural error could have been harmless, were there no conflict, or if the vocational expert had provided sufficient support for her conclusion so as to justify any potential conflicts.  *Id.*  As such, Evans' contention, that failure to ask the VE whether there is a conflict with the DOT is per se legal error, is incorrect.

### B.        Incomplete Hypothetical Questions

Evans argues that the hypothetical questions posed to the VE were incomplete because they did not include the opinions of Drs. Huffman, Sims, Roxan or Posner, nor did they include the ALJ's

own findings cited at step two of his decision.  Because these contentions are, in substance, identical to the arguments Evans asserts concerning the alleged internal inconsistencies of the ALJ's decision, discussed above in Section I.A., and the weighing of medial opinion evidence, discussed above in Section I.B, the Court will discuss them only briefly here.

As previously discussed, the ALJ rejected the opinions of Drs. Huffman, Sims, Roxan, and Posner, in whole or in part, based on specific and legitimate reasons supported by substantial evidence.  Likewise, the Court explained above that the ALJ's findings at step two of the analysis were not internally inconsistent with his findings at step four and therefore Evans' argument that the ALJ failed to include such findings fails.  The ALJ's hypothetical to the VE was proper because it contained all functional limitations (Evans' RFC) the ALJ found supported by the medical evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. Or. 2005) ("The hypothetical that the ALJ posed to the VE contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record. The ALJ's reliance on testimony the VE gave in response to the hypothetical therefore was proper.").  As such, the ALJ's hypothetical was not flawed.

**C.      Jobs Offered at Step Five**

Evans submits that she is unable to perform the jobs identified by the VE at step five, namely that of bench assembler and bench packager.  Specifically, Evans argues that working with others is an essential part of these jobs, citing the DOT's description for bench assembler: "Frequently works at bench as a member of assembly group assembling one or two specific parts and passing unit to another worker."  (Mot. 23)

However, the DOT description is not inconsistent with the ALJ's hypothetical, which incorporated Evans' RFC.  While the RFC limited Evans to occasional interaction with the public and coworkers (AR 28), passing one unit to another coworker *is* very "limited interaction."  Evans' objections to the jobs cited as viable by the VE are based entirely on speculation and not on any authority or evidence in the record.

Evans also asserts that with respect to the physical demands of the jobs, the VE acknowledged that a bench assembler performing at the "sedentary" level cannot perform the requisite tasks with 10 minute stretch breaks hourly.  However, while the VE did testify that for

some sedentary jobs, 10 minute sitting breaks would be an aberration, when the ALJ changed the hypothetical to sedentary jobs with opposite stand option, the VE testified that the jobs of packing or inspecting would be viable.  (AR 77)  Then, when the ALJ asked the VE the question "could you give me examples of sedentary jobs that would fit the hypothetical?" the VE testified "Well, I think bench assembly is probably the best example . . . DOT 706.684-022.  At the sedentary locally, about 1600 [jobs], nationally about 60,00."  (AR 79)  Thus, Evans' objection, that the jobs offered by the VE are inconsistent with her RFC, is meritless.

For the foregoing reasons, the ALJ's questioning of the VE was free of legal error. Furthermore, the VE's testimony, upon which the ALJ relied, constitutes substantial evidence.  *Kus v. Astrue*, 276 Fed. Appx. 555, 557 (9th Cir. Wash. 2008) (vocational expert's testimony constitutes substantial evidence).   Accordingly, the ALJ's findings at step five, that Evans is able to perform jobs existing in significant numbers in the national economy, is based on substantial evidence.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Cross Motion for Summary Judgment [Docket No. 11], DENIES Evans' Motion for Summary Judgment [Docket No. 10], and AFFIRMS defendant's decision regarding whether Clay is eligible for disability or supplemental security income benefits.

IT IS SO ORDERED.

September 30, 2008

_____
Saundra Brown Armstrong
United States District Judge